985 So.2d 413 (2007)
Andrew BAUGUS et al.
v.
CITY OF FLORENCE.
1061151.
Supreme Court of Alabama.
November 9, 2007.
*415 Elizabeth G. Messer of Gonce, Young, Collum-Butler & Messer, Florence, for appellee.
Michael C. Quillen and Alan M. Warfield of Walston, Wells & Birchall, LLP, Birmingham; *416 and William T. Musgrove III, city atty., Florence, for appellee.
LYONS, Justice.
Andrew Baugus and 11 other individuals (hereinafter "the landowners") who own real property adjacent to a landfill operated by the City of Florence (hereinafter "the City") sued the City, alleging nuisance, negligence, trespass, strict liability, and inverse condemnation. The Lauderdale Circuit Court entered a summary judgment in favor of the City, and the landowners appealed. Because the summary judgment was not a final judgment, we dismissed the appeal and remanded the case to the trial court for further proceedings. Baugus v. City of Florence, 968 So.2d 529 (Ala.2007). The trial court then entered a summary judgment in favor of the City on all claims, and the landowners again appealed. We affirm in part and reverse in part.

I. Facts and Procedural History

The landowners sought damages for nuisance, negligence, trespass, and strict liability against the City, arising from the City's operation of a landfill. The landowners also asserted an inverse-condemnation claim, alleging that the City's placement and monitoring of methane-measuring pipes on their properties constitutes a taking and/or damage to their properties.
The City opened the landfill sometime between 1969 and 1972. The landfill is adjacent to 9 parcels of property belonging to the 12 landowners. Each landowner purchased his or her respective property in or before 1993, and 8 of the 12 landowners reside on their property. The remaining four landowners own the houses on their properties, but do not reside there.
The City contends that the landfill closed in 1987 or 1988 and that it has not operated as a landfill since that time. The landowners contend that the City never officially closed all areas of the landfill and that it dumped waste at the landfill as late as 2006. A 1987 letter from the Alabama Department of Environmental Management ("ADEM") notes that the City is in the process of closing the landfill. Additionally, a 1990 letter from ADEM confirms receipt of a December 29, 1989, letter from the City stating that the landfill had been closed.
Since the closure of the landfill, the City has maintained the site in what it describes as a "post-closure care monitoring period." The City keeps the site vegetated, periodically mows the vegetation, and fills in depressions created by subsidence. For the purpose of filling such depressions, the City has occasionally deposited "clean fill"  unregulated inorganic solid such as dirt or concrete  on the site.
The decomposition of organic waste material in landfills generates methane, and methane has been consistently detected at the landfill and in the surrounding areas. Methane is an invisible gas that can become combustible if it reaches a sufficient concentration and a source of ignition is present. In 1982 ADEM informed the City that methane was migrating off the landfill above allowable limits. Again in 1984, ADEM informed the City that methane was migrating toward the landowners' properties. The City began monitoring for methane gas across from the landowners' properties in May 1987. Since at least 1991 the City has regularly measured methane levels along the perimeter of the landfill and reported the measurements to ADEM. From 1992 to 1998 the City quarterly reported monitoring results to ADEM. Since 1998 the City has monitored the perimeter of the landfill annually.
After several landowners expressed concern to a City councilman about the migration *417 of methane in 1994, the City retained an engineering firm to monitor the amount of methane on the landowners' properties. Of the 12 landowners, 11 consented to the monitoring; the 12th landowner has not resided on her property since 1990. In the summer of 1994, the engineering firm installed PVC pipes in each landowner's yard to measure methane levels. A 3/4-inch, 3-foot long PVC pipe was inserted 2 to 2½ feet in the ground at each corner of the landowner's house.
Since September 1994, the engineering firm has taken a monthly methane reading from the pipes and has produced a monthly report of the level of methane detected on each property. By December 1994, a detectable amount of methane was found on each property. The eight landowners who have resided on their property since 1995 have received copies of some or all of the monthly monitoring reports for their property.
On March 19, 2002, pursuant to § 11-47-23, Ala.Code 1975, the landowners informed the City of their intent to sue the City seeking damages for injuries caused by (1) the City's operation of the landfill, (2) the migration of methane from the landfill onto their properties, and (3) the monitoring of methane levels on their properties. The landowners then brought a nuisance claim and an "unlawful-taking" claim against the City on January 17, 2003. The City moved to dismiss or for a more definite statement. On February 24, 2003, the landowners filed an amended complaint, restating the "unlawful-taking" claim as an inverse-condemnation claim.
The City moved for a summary judgment, and the landowners filed a second amended complaint on March 29, 2006, adding claims of trespass, continuing trespass, strict liability, and negligence. The City moved to strike the second amended complaint, but the trial court never ruled on its motion. The City never amended its motion for a summary judgment to include the four additional claims the landowners asserted in their second amended complaint. After a hearing, the court entered a summary judgment in favor of the City.
The landowners appealed to this Court. We held that the judgment appealed from was not a final judgment because the claims in the second amended complaint were never ruled upon, and we dismissed the appeal and remanded the case to the trial court for further proceedings. Baugus, supra.
On January 22, 2007, the City filed an answer to the second amended complaint and an amendment to its previous summary-judgment motion. After a hearing, the trial court denied the City's motion to strike the landowners' second amended complaint and entered a summary judgment in favor of the City on all the claims. The landowners then appealed.

II. Standard of Review

"The standard by which this Court will review a motion for summary judgment is well established:
"`The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); § 12-21-12(d)[,] Ala.Code 1975. Evidence is "substantial" if it is of "such *418 weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
"`In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).'"
Payton v. Monsanto Co., 801 So.2d 829, 832-33 (Ala.2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999)).

III. Analysis

A. Tort Claims

1. Strict-Liability Claim

The landowners contend that the trial court erred in entering a summary judgment in favor of the City on their strict-liability claim because, they argue, the migration of methane placed the landowners within a "zone of danger ... in immediate risk of physical harm" from the potential ignition of a flammable gas. The landowners' brief provides no legal authority to support the argument that the operation of a landfill and the risk of harm a landfill creates constitute an ultra-hazardous activity. "When a brief states general propositions but fails to make specific application of those propositions to the rulings assigned as error, it is waived and will not be considered on appeal." Welch v. Hill, 608 So.2d 727, 728 (Ala.1992) (citations omitted). We therefore do not deal further with the extent to which a strict-liability claim under the circumstances here presented might escape the bar of limitations, and we affirm the trial court's summary judgment as to that claim.

2. Statute of Limitations on Remaining Tort Claims

a. The Relevant Time Period

The landowners' nuisance, negligence, and trespass claims are based on the presence of methane and garbage on their properties allegedly caused by the City's negligent maintenance of the landfill. The original complaint states that "[t]he [City's] maintenance operation of the landfill and the escapage [sic] of methane gas constitutes a continuing nuisance." Additionally the second amended complaint, which added the negligence claim, states that "[t]he City knew, or should have known, it was unlawfully maintaining waste materials at the Landfill and in its vicinity, in a manner that caused, and will continue to cause, the generation, discharge migration and escape of potentially explosive gases." The landowners' trespass claims are based on (1) the disposal of waste and landfill material on their properties as recently as November 2005, and (2) the presence of landfill gases, including methane, on their properties.
The City argues that the landowners' tort claims are barred by two separate statutes of limitations because, it says, the claims accrued, if at all, more than eight years before the landowners notified the City of their claims. First, the City argues that the nuisance and negligence claims are barred by the two-year statute of limitations for tort claims in § 6-2-38, Ala.Code 1975, and that the trespass claims are barred by the six-year statute of limitations in § 6-2-34, Ala.Code 1975. The City further contends that all the tort claims are barred by the municipal non-claim *419 statute, § 11-47-23, Ala.Code 1975, which provides that tort claims seeking damages from a municipality must be presented to the City "within six months from the accrual thereof or shall be barred." Applying this six-month limitation to the date on which the landowners notified the City of their claims  March 19, 2002  the City contends that all the landowners' claims that accrued before September 19, 2001, are time-barred.
The City further argues that the tort claims based on the presence of methane are time-barred because, it argues, the claims accrued no later than 1994 when methane was detected on all the landowners' properties. The City notes that under Alabama law, a "`statute [of limitations] begins to run whether or not the full amount of damages is apparent at the time of the first legal injury.'" Garrett v. Raytheon Co., 368 So.2d 516, 519 (Ala.1979) (quoting Home Ins. Co. v. Stuart-McCorkle, Inc., 291 Ala. 601, 608, 285 So.2d 468, 473 (1973)). Thus, the City contends that a new statute of limitations did not begin to run when additional levels of methane were detected later. However, Garrett dealt with an alleged wrongful act, toxic exposure, that was not ongoing when the action commenced. In this case, we deal with the continuous and ongoing migration of methane from the landfill, which the landowners assert does not continue solely because of the previously completed activity of the City in depositing waste, but because of the City's negligent maintenance of the landfill site in the years after it had ceased to deposit waste at the landfill.
Because it is undisputed that methane was detected by no later than 1994 and it is further undisputed that methane continues to be present on the landowners' property, the issue as to the bar of limitations turns on whether the continuing emission of methane gas within the period on and after September 19, 2001, constituted a violation of a legal duty owed the landowners by the City. If a duty exists, the claims accruing after that date are actionable.

b. Existence of a Duty as of the Commencement of the Action

The landowners contend that the tort claims are not time-barred because, they argue, the statute of limitations begins to run anew each time methane gas migrates from the landfill onto their properties. See Reichert v. City of Mobile, 776 So.2d 761 (Ala.2000). Because there is "well-settled law that negligent design or construction of a drainage ditch is considered to be a permanent condition that is not abatable," Byrd v. City of Citronelle, 937 So.2d 515, 519 (Ala.2006), the landowners emphasize that their tort claims arise from the negligent maintenance of the landfill, not the negligent construction or design of the landfill. When a claim is based on negligent maintenance, each occurrence or recurrence of the injury constitutes a new cause of action. City of Clanton v. Johnson, 245 Ala. 470, 473, 17 So.2d 669, 672 (1944).
In order to establish the prima facie elements of a negligent-maintenance claim, the landowners must establish that the City had a legal duty to maintain the landfill after the landfill was closed. See Byrd, 937 So.2d at 521. The landowners assert that the City has ongoing statutory, regulatory, and common-law duties to maintain the landfill. The City contends that the landowners have not presented any evidence or legal authority indicating that the City has such a duty.
The existence of a duty is a question of law for the court to resolve. State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 839 (Ala.1999). The entry of a summary judgment indicates that the trial *420 court concluded that the City does not have a duty to maintain the landfill after its closure.
To establish a regulatory duty to maintain the landfill, the landowners rely on certain ADEM regulations in the Alabama Administrative Code. The landowners argue that a phrase from Ala. Admin. Code (Environmental Management), rule 335-13-4-.16 (2005), which states that "[s]pecial attention shall be given to control and monitoring of explosive gases," including methane, establishes that the City has a duty to control and monitor the landfill. However, this rule, dealing with requirements for obtaining a permit to operate a landfill, refers to "a landfill unit which accepts organic waste." These requirements thus deal with an ongoing operation. The City obtained a permit to operate the landfill from ADEM and then, as of December 1989, informed ADEM that it had closed the landfill. The landowners also argue that Ala. Admin. Code (Environmental Management), rule 335-13-4-.20 (2005) requires the City to control the methane gas migrating from the landfill, but the rule requires the City only to monitor methane levels postclosure, which the City has done. We conclude that the City has no regulatory duty to control the methane migrating from the landfill after the landfill closed.
To obtain a permit to operate a landfill, a landfill permittee must prepare and file an explosive-gas monitoring plan, which includes a remedial plan for explosive-gas releases. Ala. Admin. Code (Environmental Management), rule 335-13-4-.16(2) (2005). The landowners assert that under ADEM's Minimum Requirements for an Explosive Gas Monitoring Plan at Solid Waste Disposal Sites in the State of Alabama, derived from §§ 22-27-3 and -7, Ala.Code 1975, the City has a duty to control the migration of methane, notwithstanding that the landfill has been closed. The explosive-landfill-gas monitoring plan the City drafted, in compliance with the ADEM regulation, in 1991, over one year after the date the City contends that the landfill closed in December 1989, provides that if a "dangerous level" of gas is measured "the City will relocate citizens as is necessary to safe places (at City expense), make contact with ADEM, and perform remedial measures as are necessary to remove the threat." The monitoring plan further states that the City will monitor the site "at least twice yearly and more often if necessary due to the proximity of the homes." We conclude that the City imposed a duty upon itself to monitor the amount of methane generated from the landfill and to perform remedial measures to remove the threat of a "dangerous level" of methane after the landfill closed.
The landowners also assert that the City has an ongoing common-law duty to maintain the landfill. The landowners cite Harris v. Town of Tarrant City, 221 Ala. 558, 560, 130 So. 83, 84-85 (1930), in which this Court held that after an improvement to a drainage system is complete "the city is responsible for the careless and negligent manner in which it is maintained by it." More recently, in Kennedy v. City of Montgomery, 423 So.2d 187, 188-89 (Ala.1982) (citations omitted), this Court held that "[o]nce the authority to construct or maintain a drainage system is exercised, a duty of care exists, and a municipality may be liable for damages proximately caused by its negligence. This reflects the familiar tort principle that liability may arise from the negligent performance of a voluntary undertaking."
This Court has not previously considered whether a municipality has a common-law duty to maintain a landfill after its closure. After considering all the evidence, we hold that, under the facts of this *421 case, a municipality has a common-law duty to maintain a landfill it owns after the closure of the landfill. Maintaining a landfill includes (1) maintaining the waste deposited that is not in a totally dormant state and (2) controlling the methane gas generated by the waste. Although the landfill is "closed," the City continues to own the property for a public purpose, a place to store previously deposited waste materials. It is undisputed that the City is aware of the fact that previously deposited waste materials at the site are not in a passive state but constantly continue to decompose, causing the emission of methane every day.
We conclude that the landowners' tort claims do not arise from the installation of the landfill, but from the continuous migration of methane onto their properties as a result of the City's maintenance and ongoing operation of the landfill for a public purpose subsequent to its closure. The landowners' tort claims of nuisance, negligence, and trespass accrue each time the City's maintenance and ongoing operation of the landfill causes methane to migrate onto the landowners' property and, thus, those claims are not time-barred. That the City elected to deal with the problem caused by its ongoing operation by merely monitoring the release of gas, as opposed to more aggressive curative measures the landowners allege could have been undertaken, does not, as a matter of law, constitute a defense to the action under the circumstances here presented. However, any claims for damages that accrued before September 19, 2001, six months before the landowners informed the City of their intent to sue the City, are barred by the municipal nonclaim statute, § 11-47-190. We, therefore reverse the summary judgment as to the nuisance, negligence, and both trespass claims and remand the cause for further proceedings.

B. Inverse-Condemnation Claim

The landowners contend in their brief to this Court that the trial court erred in entering a summary judgment in favor of the City on their inverse-condemnation claim because, they say, they presented substantial evidence indicating that the City (1) dumped garbage on the their properties, (2) continues to allow methane to occupy their properties, and (3) installed PVC pipes on their properties to monitor the methane. However, the landowners' amended complaint alleges inverse condemnation due only to the installation and periodic monitoring of the PVC pipes. The complaint states:
"[T]he [City] has taken and/or damaged the property of the [landowners] without resorting to the powers of eminent domain in that the [City] has continually entered upon the [landowners'] property and placed devices upon [landowners'] property for the purposes of measuring said methane gas as appropriated to the [landowners'] property for such use."
We thus disregard any theory based on dispersal of garbage on the landowners' properties. See Engel Mortgage Co. v. Triple K Lumber Co., 56 Ala.App. 337, 343, 321 So.2d 679, 684 (Civ.App.1975) ("Summary judgment must be granted or denied on the record which is before the trial court at the time the motion is heard. A party cannot add new theories or advance new issues in order to gain reversal of the ruling on the motion for summary judgment.").
The City argues that the inverse-condemnation claim is time-barred and that the landowners failed to establish substantial evidence of the essential elements of an unlawful-taking claim. Specifically, the City argues that the landowners failed to *422 establish that the City's placement and periodic monitoring of the PVC pipes on the landowners' properties constitutes an unconstitutional taking of property for public use. Under Art. I, § 23, Alabama Constitution of 1901, and the Fifth Amendment of the United States Constitution, a governmental entity is required to pay just compensation to a property owner when his or her property has been taken for public use. Ala. Const.1901, Art. I., § 23 ("private property shall not be taken for, or applied to public use, unless just compensation be first made therefor"); United States Const., amend. V ("nor shall private property be taken for public use, without just compensation").
The City's placement and periodic monitoring of the PVC pipes on the landowners' properties is not an inverse condemnation of the landowners' properties because the methane monitoring is not performed for a public use, but for the benefit of the landowners. The City maintains other PVC pipes on the perimeter of the landfill to measure levels of methane migrating from the landfill, but it measures methane at the landowners' houses for the benefit of the landowners. All the landowners who continue to reside on the properties testified that they want the City to continue monitoring the methane.
Moreover, the installation and monitoring of the PVC pipes does not constitute a taking of the landowners' properties. To be a taking for constitutional purposes, the governmental action "must `constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property.'" Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing Sanguinetti v. United States, 264 U.S. 146, 149, 44 S.Ct. 264, 68 L.Ed. 608 (1924)). Eleven of the 12 landowners consented to the installation and monitoring of the PVC pipes, and, as noted above, the landowners currently residing on the properties want the monitoring to continue. The City's installation and periodic monitoring of the pipes on the landowners' properties does not amount to an unconstitutional taking. Therefore, the trial court properly entered the summary judgment for the City on the landowners' inverse-condemnation claim.

IV. Conclusion

We affirm the summary judgment as to the strict-liability and inverse-condemnation claims. We reverse the summary judgment as to the nuisance, negligence, and trespass claims, and we remand the case to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in part and concurs in the result.
MURDOCK, Justice (concurring in part and concurring in the result).
I concur with the main opinion in all respects, except as to part III.A., as to which I concur only in the result.