LYONS, Justice.
 
 [1]
 

 Judith P. Bryan and 35 other parties (collectively “the farmers”) appeal from a
 
 *110
 
 summary judgment entered in favor of Alabama Power Company (“APCo”) by the Elmore Circuit Court on their claims of negligence and wantonness. We affirm.
 

 I.
 
 Procedural History
 

 The farmers sued APCo in the Elmore Circuit Court on February 25, 2005. They alleged that APCo negligently operated Martin Dam during flood events in May and July 2003 and that its negligent operation of Martin Dam caused flood damage to them properties, which were downstream from the dam. The farmers later amended their complaint to add a breach-of-contract claim relating to a 1972 settlement agreement involving APCo’s federal license to operate Martin Dam. On July 18, 2006, the farmers amended their complaint again, this time adding a claim of wantonness and abandoning the breach-of-contract claim.
 

 The parties completed discovery, and on August 25, 2006, APCo moved for a summary judgment. The trial court granted APCo’s motion on January 19, 2007, and entered a summary judgment in APCo’s favor as to both the negligence and the wantonness claims. The trial court based its decision, in part, on
 
 Ellis v. Alabama Power Co.,
 
 431 So.2d 1242 (Ala.1983). The farmers filed a timely notice of appeal to this Court.
 

 II.
 
 Facts
 

 A.
 
 Mar-tin Dam
 

 It is undisputed that the farmers own property near the Tallapoosa River. APCo operates four hydroelectric dams on the Tallapoosa River upstream from the farmers’ property. From north to south they are: Harris Dam, Martin Dam, Yates Dam, and Thurlow Dam. Yates Dam and Thurlow Dam are “run of the river” dams, which have no ability to store water and therefore release as much water as flows into them. Harris Dam and Martin Dam have reservoirs that form artificial lakes above the dams. The reservoirs provide storage space in which inflowing water may be held instead of being released downstream. Harris Dam and Martin Dam are therefore able to implement flood-control measures to the extent that storage space is available in their reservoirs.
 

 The amount of storage space available in a reservón* is directly related to the level of the lake behind the dam. The higher the lake level, the less storage space is available for inflowing water. Lake level is measured in terms of feet above mean sea level. At Lake Martin above Martin Dam, “full pool,” i.e., the highest summer elevation of the lake, is '490 feet above mean sea level. APCo does not own land above 490 feet, and once the lake level has reached full pool there is no storage space. However, the maximum holding capacity of the reservoir at Lake Martin is in excess of 500 feet. Lake Martin’s level is controlled, in part, by releases of water through the hydraulic turbines or spillway gates at the dam.
 

 APCo operates the Harris, Martin, Yates, and Thurlow Dams under licenses granted by the Federal Energy Regulatory Commission (“the FERC”). Its licenses were originally granted by the Federal Power Commission (“the FPC”); however, the FPC’s responsibilities were transferred to the FERC on October 1, 1977. APCo’s original license for Martin Dam was issued by the FPC in 1923 for 50 years. The 1923 license did not contain any provisions regarding flood control.
 

 In 1965, when the FPC issued the license for Thurlow Dam, which is located downstream from Martin Dam, several downstream landowners attempted to intervene in the licensing proceeding. The landowners requested that the FPC require APCo to maintain storage space at
 
 *111
 
 Thurlow Dam between December 1 and April 1 to absorb floodwater. Recognizing that Thurlow Dam was a run-of-the-river dam and did not have storage space, the FPC instead inserted provisions in the license for Thurlow Dam that required APCo “to operate all of its Tallapoosa River projects, including the Martin reservoir ... [,] in a manner which will tend to insure that stages no higher than natural peak stage can occur downstream from the Thurlow dam.”
 

 In 1970, the FPC amended the Thurlow license to state the following requirements relative to APCo’s operation of Martin Dam:
 

 “Article 33. [APCo] shall coordinate the operations of all of its Tallapoosa River Projects in such a manner that, during periods when inflow to the reservoirs exceeds the water capacities of hydraulic turbines, rates of outflow from the reservoirs shall not exceed concurrent rates of inflow except to evacuate accumulated surcharge storage subsequent to the time of peak inflow.
 

 [[Image here]]
 

 “Article 35. [APCo] shall in the interests of flood control and to the extent consistent with Licensee’s power requirements, operate its [Thurlow Dam] in coordination with all of its Tallapoosa River Projects, and shall coordinate the operations, including those required under the provisions of Article 33 with the District Engineer, [United States Army] Corps of Engineers.”
 

 In a 1975 order regarding the Thurlow license, the FPC explained that “the purpose of Article 33 is not to ensure that flooding will be eliminated, but rather that operation of the project will not increase peak flood’ flow.” The FPC noted: “It is not in the public interest nor is it the duty of [APCo] to completely eliminate flooding to the detriment of power generation, recreation in the reservoir, and other project purposes.”
 

 Articles 33 and 35
 
 [2]
 
 of the Thurlow license applied to all APCo’s Tallapoosa River dams, including Martin Dam. APCo’s representatives testified during depositions in this case that these provisions still apply to Martin Dam. Martin Dam is not subject to mandatory flood-control regulations of the United States Army Corps of Engineers (“Corps of Engineers”), as is Harris Dam, which is upstream from Martin Dam; however, Article 35 requires APCo to coordinate its operation of Martin Dam with the Corps of Engineers.
 

 In 1970, three years before its 1923 license for Martin Dam was to expire, APCo filed an application with the FPC to renew the license. Pursuant to then existing federal regulations, APCo filed an exhibit with its application, Exhibit H, detailing how it would operate Martin Dam during times of low, normal, and flood flows. 18 C.F.R. § 4.41 (1970). Two groups of individuals intervened in the application process and commented regarding APCo’s proposed operation of Martin Dam under Exhibit H.
 

 First, the Lake Martin Recreation Association (“LMRA”) objected to operation of Martin Dam in a manner that would allow lake levels to fluctuate or to remain low during the summer months. The LMRA contended that “the configuration of Lake Martin is such that a draw down of only a few feet exposes thousands of acres of [lake] bottom,” rendering boat ramps, wharves, and piers unuseable. Second, downstream landowners objected to the operation of Martin Dam in a manner that would allow high lake levels during rainy seasons. Specifically, they wanted the
 
 *112
 
 FPC to require APCo to maintain storage space in the Lake Martin reservoir between December 1 and April 1 each year. They stated: “There exists no threat of flood between 1 April and 15 September. Thus, during this period (1 April — 15 September), there exists no valid flood control reason that a relatively stable pool level would not be maintained at Lake Martin near maximum elevation.”
 

 After negotiations, APCo and the inter-venors reached an agreement regarding the drawdown and fluctuation of the lake level at Lake Martin. Pursuant to that agreement, APCo drafted a revised Exhibit H (“Settlement Exhibit H”), which balanced the competing interests of the LMRA and the downstream landowners. Settlement Exhibit H included a chart showing the flood-control guideline and the operating guideline for Martin Dam. The flood-control guideline specifies the high lake level at which mandatory flood-control operations will engage throughout the year. The operating guideline is a guide for target lake levels throughout the year; it is not mandatory. Together, the flood-control guideline and the operating guideline make up the “operating curve” for Lake Martin. From May through mid-July, the operating curve shows the flood-control guideline at full pool, 490 feet, and the operating guideline at 489 feet. Accordingly, for the months at issue in this action, Settlement Exhibit H specified that APCo was to maintain Lake Martin at a lake level between 489 and 490 feet.
 

 Depending on the lake level specified by the operating curve, Settlement Exhibit H established flood-control operations for Martin Dam in the form of controlled releases of water increasing to no more than 50,000 cubic feet per second (“cfs”) up to a lake level of 490 feet. If the lake level continued to rise above 490 feet, Settlement Exhibit H specified that APCo should operate Martin Dam at its full discharge capacity of 145,000 cfs only after lake level reached 490.5 feet. Settlement Exhibit H also stated that APCo was to communicate with the Corps of Engineers during flood periods and to modify its operations pursuant to instructions from the Corps of Engineers if greater flood-control benefits could be attained. APCo filed Settlement Exhibit H with the FPC in February 1973, and the intervenors withdrew their objections. At the FPC’s request, the Corps of Engineers reviewed Settlement Exhibit H. The Corps concluded that “the seasonal operating plan for the Martin project as shown in [Settlement] Exhibit H is satisfactory with respect to flood control operation.”
 

 The FPC extended APCo’s license to operate Martin Dam. In May 1978, after the transfer of authority from the FPC to the FERC in 1977, the FERC issued APCo a new license to operate Martin Dam for 40 years, effective as of the 1973 expiration of its original license. In the 1978 license, the FERC identified numerous purposes and uses of the Martin Dam and reservoir, including “limited flood control” when the reservoir is in drawdown condition. The 1978 license included Settlement Exhibit H and recognized the flood-control obligations imposed by Articles 33 and 35 of the Thurlow license.
 
 [3]
 
 Consistent with the operating curve in Settlement Exhibit H, the license states that the reservoir will usually reach full pool in May and maintain an elevation above 487 feet until after September 1.
 

 
 *113
 
 In November 1978, APCo sent a letter to the FERC informing the FERC of changes APCo was implementing in the proposed flood-control operations of Martin Dam. APCo advised the FERC that it wanted to delete certain paragraphs from the flood-control operations detailed in Settlement Exhibit H and replace them with the following statement:
 

 “When the reservoir is above the Flood Control Guideline and above elevation 488, turbines at Martin Dam will be operated [to provide a continuous outflow of approximately 11,000 cfs] and further, if required to avoid rising above elevation 490.0, will be operated to provide an outflow from Martin Reservoir at least equivalent to all turbine units available operating at full gate and gates will be raised so that the reservoir will not exceed elevation 490.0 except after all gates are raised and inflow exceeds the gate capacity. At elevation 490.0, the spillway will have a discharge capacity of 133,000 cfs.”
 

 Accordingly, the 1978 amendment did not allow the lake level to rise above 490 feet and did not prevent APCo from using its full discharge capacity of 145,000 cfs until the level reached 490.5 feet. As previously noted, Settlement Exhibit H had specified that APCo should operate Martin Dam at its full discharge capacity of 145,000 cfs only after the lake level had reached 490.5 feet. APCo’s representatives testified that APCo made this change because it did not own property above 490 feet. The change did not affect the flood-control guideline or the operating curve. APCo did not notify the 1970 intervenors of the change. APCo offered to provide additional information regarding the change in operations to the FERC; however, the FERC never requested more information from APCo. The FERC did not expressly approve the 1978 amendment to Settlement Exhibit H. However, at APCo’s request, after the farmers commenced this action, the FERC confirmed that the 1978 amendment to Settlement Exhibit H is binding on APCo.
 

 Pursuant to the operating curve in Settlement Exhibit H as amended by the 1978 amendment, APCo maintained Lake Martin at full pool — 490 feet — or slightly below during the summer months. In 1989, without prompting from the FERC, the Corps of Engineers, or any outside source, APCo decided to maintain one-half foot of storage in the Lake Martin reservoir and thereafter maintained Lake Martin at 489.5 feet during the summer months. APCo used the one-half foot of storage for several project purposes, including flood control. APCo’s representatives testified that the additional one-half foot of storage enables APCo to begin flood-control operations at a lower lake level and helps prevent the lake level from rising above 490 feet. APCo pre-evacuates water in anticipation of flood events through the turbines at Martin Dam; it does not release water through the dam’s spillway gates for pre-evacuation purposes.
 

 B.
 
 The May 2003 Flood
 

 The Tallapoosa River basin flooded in early May 2003 as a result of heavy rainfall upstream and downstream from Harris Dam. It is undisputed that APCo maintained the lake level at the Martin reservoir in compliance with the operating curve in Settlement Exhibit H, as amended, before the flood. The parties dispute how far in advance APCo was on notice of the potential for flooding in May 2003. The parties also dispute whether APCo could have been aware of the precise location rainfall would be heaviest and, consequently, where inflows would be higher along the Tallapoosa River.
 

 It is undisputed that on May 7, 2003, APCo pre-evacuated water through the
 
 *114
 
 turbines at Martin Dam and lowered the lake level to 489.24 feet. Accordingly, the Martin reservoir had approximately .7 feet of storage space for flood-control operations at the time of the May 2003 flood. The inflow into the Martin reservoir peaked between 1 and 2 o’clock a.m. on May 9, 2003. During the storms, APCo engaged in controlled releases of water, keeping the lake level at 489.94 feet. The peak discharge from Martin Dam during the flood was approximately 128,300 cfs. APCo’s flood-control operations reduced flows by approximately 9,300 cfs immediately downstream from Martin Dam.
 

 It is undisputed that during the May 2003 flood, APCo complied with the flood-control procedures in the 1978 amendment to Settlement Exhibit H and with Articles 33 and 35 of the Thurlow license. APCo also coordinated with the Corps of Engineers as required by Settlement Exhibit H. At all times during the May 2003 flood, the rate of outflow from Harris, Martin, Yates, and Thurlow Dams was less than the concurrent rate of inflow, except after the inflow peaked and the dams were operated to evacuate water that had accumulated in the storage spaces of the reservoirs.
 

 The parties dispute whether the May 2003 rain event was a common event or an unusual event. The record does not include detailed information regarding damage to the farmers’ properties as a result of the May 2003 flood; however, the parties do not dispute that the farmers’ properties were damaged. The fanners’ expert testified that APCo did not maintain storage space at Martin reservoir during the summer months and that what storage space was available during the May 2003 flood was not enough. The expert declined to state what lake level APCo should have maintained at Lake Martin; however, he opined that APCo should have reserved between 2 and 3 feet of storage space during the summer months for flood control, thus maintaining a lake level of between 487 and 488 feet, below the operating curve.
 

 The farmers’ expert admitted that his calculations did not account for intervening flows downstream from Martin Dam and stated that even more storage space should have been reserved to account for downstream flows between Martin Dam and the farmers’ properties. The expert also testified that an additional foot and a half of storage space would not have prevented the May 2003 flooding and that operating under the flood-control procedures stated in Settlement Exhibit H instead of the 1978 amendment would not have made any appreciable difference in the flooding that occurred downstream.
 

 C.
 
 The July 2003 Flood
 

 In early July 2003, the Tallapoosa River basin flooded as a result of heavy rains associated with Tropical Storm Bill. The record shows that meteorologists had made errors in predicting the path of the storm such that heavy rains were not predicted for the Tallapoosa River basin until June 30, 2003, the day before the heaviest rainfall of the storm on the morning of July 1, 2003. On June 30, 2003, APCo lowered the lake level in the Martin reservoir from 489.6 feet to 489.47 feet, leaving .53 feet of storage space. The band of heaviest rainfall was split evenly upstream and downstream from Martin Dam but did not reach as far upstream as Harris Dam. The inflow into the Martin reservoir peaked between 9 and 10 o’clock a.m. on July 1, 2003. During the storm, APCo engaged in controlled releases of water, keeping the lake level at 489.99 feet. The peak discharge from Martin Dam during the flood was approximately 90,881 cfs.
 

 It is undisputed that APCo maintained the lake level at the Martin reservoir in
 
 *115
 
 compliance with the operating curve in Settlement Exhibit H before the flood. It is also undisputed that, during the July 2008 flood, APCo complied with the flood-control procedures stated in the 1978 amendment to Settlement Exhibit H, complied with Articles 33 and 35 of the Thur-low license, and coordinated its actions with the Corps of Engineers. At all times during the July 2003 flood, the rate of outflow from Martin, Yates, and Thurlow Dams was less than the concurrent rate of inflow, except after the inflow peaked and the dams were operated to evacuate the water that accumulated in the storage space of the reservoir for the Martin Dam. During the period of greatest inflows into the Martin reservoir, APCo’s operation of Martin Dam reduced downstream flows by 6,383 cfs.
 

 The record does not include detailed information regarding damage to the farmers’ properties as a result of the July 2003 flood, but the parties do not dispute that the farmers’ properties were damaged. The farmers’ expert testified, as he did regarding the May 2003 flood, that APCo should have maintained two to three feet or more of storage space in the Martin reservoir. However, he also testified that an additional foot and a half of storage space would not have prevented the July 2003 flooding. He admitted that operating under the flood-control procedures stated in Settlement Exhibit H instead of the 1978 amendment would not have made any appreciable difference in the flooding that occurred downstream. He also testified that rainfall downstream from Martin Dam contributed to the flooding.
 

 III.
 
 Standard of Review
 

 “ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion.... ’
 
 McClendon v. Mountain Top Indoor Flea Market, Inc.,
 
 601 So.2d 957, 958 (Ala.1992).
 

 “ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala. 1989).’
 

 “Capital Alliance Ins. Co. v. Thorough-Clean, Inc.,
 
 639 So.2d 1349, 1350 (Ala. 1994). Questions of law are reviewed de novo.
 
 Alabama Republican Party v. McGinley,
 
 893 So.2d 337, 342 (Ala.2004).”
 

 Alabama Elec. Coop. v. Bailey’s Constr. Co.,
 
 950 So.2d 280, 283 (Ala.2006).
 

 IV.
 
 Analysis
 

 On appeal, the parties primarily argue whether APCo owed a heightened duty of flood control to the farmers with respect to its operation of Martin Dam. Both the farmers’ negligence claim and their wantonness claim require proof that
 
 *116
 
 APCo owed them a duty. See, e.g.,
 
 DiBiasi v. Joe Wheeler Elec. Membership Corp.,
 
 988 So.2d 454, 460 (Ala.2008);
 
 George v. Alabama Power Co.,
 
 13 So.3d 360, 364 (Ala.2008). “In Alabama, the existence of a duty is a strictly legal question to be determined by the court.”
 
 Taylor v. Smith,
 
 892 So.2d 887, 891 (Ala.2004). See also
 
 Baugus v. City of Florence,
 
 985 So.2d 413, 419 (Ala.2007) (“The existence of a duty is a question of law for the court to resolve.”).
 

 A.
 
 APCo’s Common-Law and Federally Imposed Duties
 

 This Court has stated: “It is settled by our decisions that one who constructs a dam in a navigable stream is not an insurer against damages to lower owners, even when such damages are caused by the breaking of the dam. Some element of negligent conduct must appear.”
 
 Alabama Power Co. v. Smith,
 
 229 Ala. 105, 111, 155 So. 601, 604 (1934). Regarding the duty owed by the operator of a dam to downstream landowners, this Court has more recently stated:
 

 “The law in Alabama is clear that an action which asserts liability for damages for the release of water will not lie in the absence of negligence. This Court has consistently held that one who owns or operates a dam owes a duty to lower riparian owners only to exercise reasonable care in operating or maintaining the dam.”
 

 Ellis v. Alabama Power Co.,
 
 431 So.2d 1242, 1245 (Ala.1983).
 

 In
 
 Ellis,
 
 landowners on the Coosa River between Lay Dam and Mitchell Dam sued APCo, alleging negligence, trespass, and nuisance in connection with the flooding of their property in 1979. The trial court entered a summary judgment in APCo’s favor, and the landowners appealed. The evidence showed that APCo had operated Mitchell Dam and Lay Dam and Logan Martin Dam, which is upstream from the Mitchell and Lay Dams, subject to and in compliance with regulations of the Corps of Engineers. The evidence also showed that the peak discharge from Logan Martin Dam during the 1979 flood was not greater than would have occurred under natural conditions, i.e., if there had been no dam. 431 So.2d at 1243-44.
 

 This Court determined that APCo was not liable in nuisance because the landowners complained of a public nuisance and had no private right of action. 431 So.2d at 1244. Regarding trespass, this Court concluded that the landowners had failed to show that APCo’s actions were unlawful or wrongful. With respect to negligence, this Court clarified the duty owed to a lower riparian landowner as quoted above and agreed with the trial court’s finding that the landowners failed to meet the burden of proof of negligence. This Court also noted that the landowners had not cited any authority imposing on APCo the duty to acquire an additional storage easement.
 

 The
 
 Ellis
 
 Court buttressed its findings of failure to offer evidence of wrongful, unlawful, or negligent conduct with dicta as to absence of evidence of causation, stating:
 

 “Further, even assuming
 
 arguendo
 
 that there was a showing of negligence on the part of APCo, there was no showing by plaintiffs that this negligence proximately caused
 
 in fact
 
 the damage to their property
 
 (i.e.
 
 that absent the dams their property would not have been flooded to the same extent or perhaps more so).”
 

 Ellis,
 
 431 So.2d at 1246. The Court noted that APCo’s operation of Mitchell Dam had actually mitigated the flooding of the landowners’ properties. In
 
 Ellis,
 
 this Court found uncontradicted evidence of
 
 *117
 
 compliance with federal regulations to be incompatible with a claim of breach of duty to a lower riparian landowner.
 

 The farmers attempt to distinguish
 
 Ellis
 
 on the basis that the dams at issue in that case were subject to regulations of the Corps of Engineers while Martin Dam was not. However, the evidence showed that APCo’s operation of Martin Dam was subject to federal regulation in the form of the FERC licenses for Martin and Thurlow Dams. Although they were not as detailed as the regulations of the Corps of Engineers, at all times relevant to this action the FERC licenses imposed specific duties on APCo with respect to its operation of Martin Dam. For example, the operating curve of the 1978 FERC license for Martin Dam specified that APCo was to maintain the lake level between 489 and 490 feet. Additionally, the FERC licenses specified that during flood periods APCo was not to operate Martin Dam with a rate of outflow greater than the concurrent rate of inflow. Furthermore, the FERC licenses required APCo to communicate and coordinate with the Corps of Engineers with respect to its flood-control operations. The record shows that the FERC licenses govern many other aspects of APCo’s operation of Martin Dam as well. In light of the extensive federal involvement in APCo’s operation of Martin Dam via the FERC licenses, it is apparent that Martin Dam is part of a general scheme of federal coordination and regulation of navigable waterways, including coordination with the Corps of Engineers. We do not find the fact that Martin Dam is not subject to detailed Corps of Engineers regulations to be a material point of distinction between this action and
 
 Ellis.
 

 As in
 
 Ellis,
 
 APCo complied with the federal regulations governing its operation of Martin Dam during the floods at issue in this action. Pursuant to the FERC licenses, APCo maintained lake levels within the operating curve before the May and July 2003 floods; communicated and coordinated with the Corps of Engineers during the floods; and maintained outflows less than the concurrent rate of inflow. The farmers argue that APCo did not actually comply with the requirements of its FERC license because it operated pursuant to the flood-control operations stated in the 1978 amendment to Settlement Exhibit H and that amendment had not been expressly approved by the FERC. However, the evidence presented to the trial court from the farmers’ expert shows that this distinction is irrelevant. As to both the May and July 2003 floods, the farmers’ expert testified that APCo’s operation under the flood-control procedures stated in Settlement Exhibit H instead of those stated in the 1978 amendment would not have made any appreciable difference in the flooding that occurred downstream. Accordingly, APCo’s compliance with the flood-control requirements in the 1978 amendment instead of Settlement Exhibit H is immaterial.
 

 The evidence shows that the 1978 amendment and Settlement Exhibit H were identical with respect to the lake level of the Martin reservoir, the farmers’ primary area of grievance. They were also identical with respect to APCo’s general operating requirements during flood flows. The evidence showed that APCo complied with those requirements and satisfied its federally imposed duties with respect to the operation of Martin Dam during the May and July 2003 floods. Additionally, it is apparent from the record that APCo’s activities during the floods lessened the outflows from Martin Dam such that the flooding that did occur downstream was less than what would have occurred naturally. Accordingly, the evidence showed that APCo complied with
 
 *118
 
 its common-law duty not cause greater flooding than would have occurred naturally.
 

 B.
 
 A Heightened Duty of Flood Control
 

 The farmers concede that APCo does not owe them a duty to eliminate flooding. However, they contend that APCo owed them a “heightened duty” of flood control beyond that imposed by the common law or by federal regulation. Specifically, the farmers contend that, under this heightened duty, APCo was required to “minimize” downstream flooding by maintaining “adequate” storage capacity in the Martin reservoir.
 

 The farmers do not cite to any Alabama law to support the imposition of such a duty. They do not define what they mean by “minimizing” downstream flooding. Furthermore, they expressly decline to state what storage capacity would be “adequate” under their formulation of the heightened duty. The farmers appear to base their argument regarding the heightened duty, in part, on their argument regarding a voluntary assumption, which will be discussed separately below. However, to the extent that the farmers argue that APCo owed them an independent “heightened duty” of flood control, the farmers have not cited any authority to support their argument, and we are not persuaded that such a duty exists or that this Court is the suitable entity properly .equipped to set standards applicable to such a duty.
 

 C.
 
 Voluntary Assumption
 

 Finally, the farmers contend that APCo voluntarily assumed a duty to operate Martin Dam for flood control during the summer months. For purposes of this argument, the farmers define “flood control” and APCo’s resulting duty as the maintenance of a lake level at Martin reservoir between 487 and 488 feet, so as to allow 2 to 3 feet of storage in the reservoir. The basis for the scope of this duty apparently rests on the testimony of the farmers’ expert that APCo should have maintained two to three feet of storage in the Martin reservoir. The farmers also argue that flood control includes pre-evacuation of the reservoir to create additional storage before a flood event.
 

 The farmers argue that APCo assumed this duty by voluntarily maintaining the lake level at Martin reservoir at 489.5 feet during the summer months, thus providing .5 feet of storage space in the reservoir. The farmers also note that one of APCo’s representatives testified that APCo in fact operated Martin Dam for flood-control purposes all year and that “flood control” involved minimizing downstream floods. An APCo representative also testified that APCo did, at times, pre-evacuate the Martin reservoir to create storage space in anticipation of flood events. Based on these facts, the farmers contend that APCo voluntarily assumed the duty of flood control defined above.
 

 APCo denies that its voluntary maintenance of .5 feet of storage space imposed on it an obligation to maintain 2 to 3 feet of storage space. It also notes that its representatives testified that the .5 feet of storage space was used for multiple project purposes, including, but not limited to, flood control. Also, the record shows that another of APCo’s representatives testified that “flood control” involved only reducing outflows, not minimizing floods. Furthermore, the record shows that the .5 feet of storage space is within the operating curve stated in the 1978 FERC license whereas any duty to operate Martin reservoir between 487 and 488 feet would require APCo to maintain a lake level below that specified in the operating curve.
 

 
 *119
 
 This Court has stated: “Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith.”
 
 Dailey v. City of Birmingham,
 
 378 So.2d 728, 729 (Ala.1979). “However, the existence of a voluntarily assumed duty through affirmative conduct is a matter for determination in light of all the facts and circumstances.”
 
 Parker v. Thyssen Mining Constr., Inc.,
 
 428 So.2d 615, 618 (Ala. 1983). The relevant inquiry often involves the scope, as well as the existence, of the duty assumed. See, e.g.,
 
 Springhill Hosps., Inc. v. Lammore,
 
 5 So.3d 513, 516 (Ala.2008) (noting that the scope of a pharmacist’s voluntary undertaking is a fact-specific inquiry);
 
 Dailey v. Housing Auth. for Birmingham Dist.,
 
 639 So.2d 1343, 1346 (Ala.1994) (discussing the limits of the scope of a duty voluntarily assumed where landlord hired security guard);
 
 Hodge v. United States Fid. & Guar. Co.,
 
 539 So.2d 229, 230 (Ala.1989) (workers’ compensation insurance case in which this Court noted that the plaintiff bears the burden of proving the scope of the duty voluntarily assumed). Furthermore, the underlying principle that the “existence of a duty is a question of law for the court to resolve” applies.
 
 Baugus v. City of Florence,
 
 985 So.2d 413, 419 (Ala.2007)
 

 We must determine whether, by maintaining .5 feet of storage space in Martin reservoir, APCo voluntarily assumed a legal duty to maintain 2 to 3 feet of storage, approximately 4 to 6 times as much. The farmers cite
 
 Kunz v. Utah Power & Light Co.,
 
 526 F.2d 500 (9th Cir.1975), to support them argument; however, they do not point to any Alabama law discussing the voluntary assumption of flood-control obligations. In
 
 Kunz,
 
 the United States Court of Appeals for the Ninth Circuit concluded that the operator of a dam had voluntarily assumed a duty of flood control where it had altered water flows and regularly stored runoff from melting snow each spring. 526 F.2d at 501-03. The Ninth Circuit noted that, in reliance on the activities of the operator of the dam, the plaintiffs in
 
 Kunz
 
 had changed their farming operations. 526 F.2d at 502. Accordingly, the Ninth Circuit concluded that a relationship existed between the dam operator and the plaintiffs such that the dam operator owed a duty to the plaintiffs to reduce flooding. 526 So.2d at 503.
 

 Most of the circumstances present in
 
 Kunz
 
 are not present in this action. No evidence shows that APCo regularly operated Martin Dam with 2 to 3 feet of storage during the months of May and July; in fact, the evidence showed that APCo annually operated Martin reservoir within .5 feet of full pool. Additionally, the farmers did not present any evidence indicating that they had altered their farming operations or any other use of their property in relation to APCo’s activities. No evidence supports the conclusion that a relationship existed between APCo and the farmers similar to the relationship upon which the Ninth Circuit based its decision in
 
 Kunz.
 

 Applying general principles regarding the voluntary assumption of a duty and the scope of the duty assumed, we cannot say that, by voluntarily maintaining .5 feet of storage for purposes not limited to flood control, APCo assumed a duty to maintain 2 to 3 feet of storage dedicated to flood control. In so concluding, we are mindful of the fact that operating Martin Dam to attain such storage would require APCo to maintain a lake level below the operating curve established by the FERC and approved by the Corps of Engineers. We are also mindful of the delicate balancing of interests between upstream and downstream landowners along the Tallapoosa
 
 *120
 
 River basin. The balancing of those interests is subject to federal regulations and has been challenged, negotiated, and agreed upon by various individuals and entities during the last several decades. The farmers have not presented adequate authority justifying this Court’s interference with the regulation and previous balancing of such interests. Accordingly, we decline to recognize a voluntary assumption of a duty of flood control.
 

 V.
 
 Conclusion
 

 Based on the foregoing, it is apparent that APCo showed that it did not breach its duty to the farmers. Accordingly, the trial court correctly concluded that no genuine issue of material fact existed and that APCo was entitled to a judgment as a matter of law. We therefore affirm the summary judgment entered by the trial court.
 

 AFFIRMED.
 

 COBB, C.J., and WOODALL, STUART, and BOLIN, JJ., concur.
 

 MURDOCK, J., recuses himself.
 

 [1]
 

 . This case was originally assigned to another Justice on this Court. It was reassigned to Justice Lyons on November 21, 2008.
 

 [2]
 

 . Article 34 is not relevant to this proceeding.
 

 [3]
 

 . The FERC's renewal of the license for Martin Dam in 1978 notes that the Martin license is subject to Articles 33-35 of the Thurlow license. The Thurlow license was subsequently amended to exclude those provisions but, based on the FERC's 1978 amendment, APCo concedes that, as to the Martin license, it remains subject to those provisions.