MURDOCK, Justice.
We granted the petition for a writ of certiorari of BASF Construction Chemicals, LLC (“BASF”),[1] in this action filed by Edward Wayne Crabtree and Jeannie West Crabtree to consider several issues raised by BASF regarding the decision of the Court of Civil Appeals to reverse the trial court’s summary judgment in favor of BASF as to the Crabtrees’ claims against BASF. We reverse the judgment of the Court of Civil Appeals.
7. Facts and Procedural History
Edward Crabtree slipped and fell on the top floor of the physician’s parking deck of a medical center owned by Mobile Infirmary Associates d/b/a Mobile Infirmary Medical Center (“Mobile Infirmary”), and he suffered injuries as a result. The Crab-trees commenced this action, naming as defendants in the lawsuit Mobile Infirmary and fictitiously named parties “B,” “C,” “D,” “E,” and “F.” Eventually, BASF was one of the parties the Crabtrees substituted for a fictitiously named defendant in an amended complaint. The Crabtrees contend that BASF is liable for Edward Crab-tree’s fall because a polyurethane product called Sonoguard, which was manufactured by BASF’s predecessor ChemRex, Inc. (“ChemRex”), which BASF acquired after the events underlying the Crabtrees’ action, was improperly installed on the floor of the parking deck where Edward Crab-tree fell and sustained his injuries.[2]
According to the manufacturer’s instructions, Sonoguard requires proper installation in order to perform as intended. Installation of the product first requires preparation of the surface area to which it will be applied. Following preparation, a “base coat” layer is applied to provide the waterproofing effect. After the base-coat layer has cured, a second “topcoat” layer is applied in varying amounts based on the amount of vehicular traffic to which the surface will be subjected. While the topcoat layer is wet, aggregate (i.e., silica sand) is broadcast over the material to provide slip resistance. To facilitate a proper application of these three layers, the manufacturer’s instructions recommend that the installer first perform a “mock-up,” i.e., an installation of the product over a smaller area to “allow for evalu *796 ation of slip resistance and appearance of the deck coating system.”
BASF employees confirmed in their deposition testimony that the proper application of Sonoguard requires a sufficient amount of aggregate. BASF Senior Technical Product Specialist Allan Mosloski testified that Sonoguard can be slippery “if you don’t get the right amount of aggregate in [it]” and that that is a “relatively common thing” to occur in its installation. BASF Mississippi/Louisiana Territory Manager Roger Sosa testified that Sono-guard is “absolutely” slippery if it lacks aggregate. BASF Alabama Territory Manager David Cook also testified that if the topcoat is too thick it will cover the aggregate and render the surface slippery.
The Mobile Infirmary campus has two public parking decks. The first is a two-story parking deck located immediately in front of the hospital (“Deck I”). The second is a four-story parking deck adjacent to the Physician’s Office Building (“Deck II”). Edward Crabtree slipped and fell on the top floor of Deck II. The Crabtrees contend, however, that events relating to the renovation of Deck I explain in part the reason that BASF should be held responsible for the installation of its product on the top floor of Deck II.
In 2002, Mobile Infirmary engaged the services of J.F. Pate and Associates Contractors, Inc. (“J.F. Pate”), as a general contractor to renovate Deck I. J.F. Pate, in turn, engaged the services of CHP Industrial and Marine, Inc. (“CHP”), as a subcontractor to waterproof the top floor of Deck I and a portion of the ramp leading up to the top floor. CHP purchased the Sonoguard applied on Deck I from a Mississippi supplier. Within a few weeks of CHP’s installation of the product, Mobile Infirmary began receiving complaints that the Sonoguard was wearing out. Roger Sosa, at that time ChemRex’s Mississippi/Louisiana Territory Manager, was notified of the problems. In an April 28, 2002, letter to his superior, Sosa related what he believed to be the causes of the problems based upon what he had been told, including that “[t]he contractor must have shot blasted[3] the deck poorly in spots because he just ordered more base coat to cover the exposed aggregate that he blasted” and “[t]he contractor may not be applying enough sand in spots.”
Between September and November 2002, Sosa visited Deck I to evaluate the problems in person, and he provided CHP with written instructions for how to remediate those problems. CHP performed a remediation, but several months later the product was wearing out again. On July 31, 2003, ChemRex Senior Technical Services Representative Thomas Karlson visited Deck I to evaluate the problems. CHP owner Clarence Poole, J.F. Pate executive Mit Kopf, and Sosa also were present during Karlson’s visit. Based on his observations, Karlson wrote Poole a detailed letter explaining the flaws he observed in the installation of So-noguard and providing his recommendations for remediating those problems. Karlson faulted “improper concrete surface preparation” as the primary reason the Sonoguard did not perform as intended. Karlson recommended “shot-blasting” the areas of Deck I that were flawed in order to remove Sonoguard and to apply a different ChemRex product, Conipur II, to those areas.
CHP performed a second remediation of Deck I in October 2003. According to *797 Sosa, Karlson and Sosa were present for the application of Conipur II so that they could “help [CHP] in any way we could.” Sosa testified to the difficulties that occurred with the second remediation.
“Unfortunately, Mr. Poole’s labor force [was] comprised of all temporary employees, which is fine [under certain conditions]. But when they started putting the material down we — me and Tom just started — red flags started going up, just through experience.
“They were not mixing it long enough. They weren’t getting it down on the floor long enough. They were keeping the material in the bucket too long. The material, when it starts heating on to itself, it just starts curing out. So probably shouldn’t have done it, but we did. We did not want to keep continuing with the problems on deck number one so Tom Karlson and myself took off our shoes, threw on some shorts and we jumped out there with his guys, and I would say that me and Tom probably did about 80% of that deck by ourselves.”
In early 2003, Mobile Infirmary engaged the services of J.F. Pate to renovate Deck II. To waterproof the top floor of Deck II and the ramp leading up to the top floor, J.F. Pate once again engaged CHP. J.F. Pate’s Kopf testified that a Mobile Infirmary vice president told him that a condition of allowing CHP to do the job was that he wanted a representative of the manufacturer of the waterproofing product present “to inspect the project, inspect the preparation before the coating went down, and inspect it after the coating was put on.” Kopf stated that he related this request to Poole and that he recalled Poole’s communicating with the manufacturer about it.
On April 15, 2003, Sosa wrote a letter to Poole that provided, in pertinent part:
“You recently informed me that you have been given the okay to proceed with the Physicians Parking Garage [Deck II]. The scope of the work is to remediate areas of ponding water and to apply a traffic grade urethane system over the existing deck. Due to complications that occurred on the previous job[, i.e., Deck I], we have both agreed that representatives from Chemrex, Inc. would be present during various times of the project to inspect the preparatory work, application of the products and to provide any technical assistance that may be required. In the beginning I recommend an inspection at least once a week to insure that all parties involved are in agreement with the manufacturer’s instructions. If it [is] necessary to be on the project more often until all parties are comfortable, then we will be happy to perform that function. I am looking forward to a successful project. Please contact me when you are ready to commence with you[r] preparatory work. If you have any questions or comments, please feel free to contact me at your earliest convenience.”
Sosa testified that he intended to have David Cook, at that time ChemRex’s Alabama Territory Manager, make site visits to Deck II in order to help CHP with any questions their employees might have concerning the application of Sonoguard. Sosa did not tell Cook specifically about the April 15, 2003, letter, but Cook testified that he and Sosa did have a conversation about Cook’s going to the project site during the course of the project. Cook stated that he visited the site four or five times throughout the project.
Both Cook and - Sosa denied that the purpose of the job-site visits was to ensure that the Sonoguard was installed correctly. Cook stated that “[m]y capacity on this job was to provide any technical service, an *798 swer any questions that Clarence [Poole] had during my visits. I was not a quality control or a quality assurance type person.” Sosa testified that he considered an “inspection” and a “job-site visit” to be synonymous, and he stated:
“At a job site visit we make ourselves available. The contractor has any questions, if he needs me to take a look at something in particular, if I can answer it I will. If I need to get a technical representative involved I will.
“So it’s basically going to the job and making sure everything is, you know, on the up and up if they have any issues or problems or questions.
“... [I]f I see something that’s unusual I’ll point it out and say now this doesn’t look right, and at that point we try to come up with a plan of action to remedy it. It might be something where the contractor did something wrong or it might be a structural defect with the substrate.... [I]t’s just — a lot of it just basically, you know, [is] seeing if you find any egregious errors.”
Poole testified that he “vaguely remember[ed]” the April 15, 2003, letter and that he understood that “Mr. Cook was supposed to be there weekly. Then I believe somewhere along the line when we seen it was taking longer he said he would be there every two weeks, if not weekly.” Poole stated that he “was relying on Mr. Cook to keep an eye on the job. The more people you have looking at any job, the easier it is to keep away from having troubles on it.” Poole also testified that he received “technical assistance” from Cook whenever he asked for it. It is undisputed that the technical data sheets that accompanied the Sonoguard in Poole’s possession stated that the “[u]ser shall determine the suitability of the products for the intended use and assume all risks and liability in connection therewith.”
CHP applied Sonoguard to Deck II in early October 2003. Cook sent a letter to Poole on October 2, 2003, stating that he made a site visit on September 30 “to observe the surface preparation on the deck surface.” In the letter, Cook told Poole how to fix “bug holes” that were opened on the parking deck after it was shot-blasted in preparation for application of the product. Cook sent another letter to Poole on October 14, 2003, in which he noted that he had made a site visit on October 10 and that, “[a]t this point it, it appears everything is in order.” The letter stated that Cook planned to make another visit later in that week.
Immediately after CHP finished the project, a parking-deck security guard reported that the ramp leading up to the top floor and the drive lanes of the top floor were “too slick.” Soon after, a Mobile Infirmary vice president drove on the top-floor deck surface and reported that it was “not acceptable and that more traction needed to be applied.” CHP’s Poole contacted Cook after receiving complaints about the slickness of the deck surface when it was wet. Cook also had received a call from a contractor doing a different job who reported that his truck had slipped when attempting to traverse the ramp up to the top floor of Deck II. Poole also drove his truck around the deck and he confirmed that the ramp and the drive lanes were slick when wet.
Cook visited the site the same week he received the complaints; he examined the ramp leading up to the top floor of the deck, but he did not examine the top floor itself, i.e., where Edward Crabtree eventually slipped and fell. At Poole’s request, Sosa also visited and examined Deck II. He told Poole that the amount of aggregate on the surface appeared to be “pretty sparse.” Sosa testified that he told Cook that he believed there was not enough *799 exposed aggregate on the deck surface and that Cook agreed with him, relating that he had told Poole the same thing.
Additionally, Poole spoke with ChemRex Senior Technical Services Representative Karlson by telephone on October 27, 2003. In a letter documenting the conversation, Karlson related that it had been discovered that “the deck coating was slippery when wet in the drive lanes but not slippery in the parking areas.” Karlson concluded that the problem was that when CHP applied the topcoat, “the aggregate was buried into the deck coating material.” In other words, the silica sand added to the topcoat to provide traction had been covered up by excessive topcoat material, rendering the drive lanes of the parking deck slippery when wet. In the letter, Karlson provided detailed instructions to Poole on how to correct the problem. Among other things, Karlson stated that a “test application” should be performed and that CHP should “backroll” aggregate material into the surface of the deck.
It is undisputed that CHP performed remediation on the ramp leading up to the top floor of Deck II but that it did not perform any remediation work on the top floor itself. It is also undisputed that CHP did not follow Karlson’s instructions by first performing a “test application” or by “backrolling” the aggregate material into the surface of the deck. It is further undisputed that Poole did not contact ChemRex representatives to inform them of when the remediation would be performed or to ask them to look at the results after the remediation had been completed.
As previously stated, Edward Crabtree slipped and fell on the top floor of Deck II on February 11, 2004. The Crabtrees subsequently commenced this action against Mobile Infirmary and several fictitiously named defendants. The Crabtrees eventually substituted J.F. Pate, CHP, and BASF for fictitiously named defendants. In their fourth amended complaint, the Crabtrees alleged that all of these parties had “a duty to inspect the application process to confirm that the polyurethane material was properly installed” and that they had “negligently and wantonly failed to inspect the installation of the polyurethane material during the application process.” This “negligence and wantonness made the premises unreasonably dangerous and/or unsafe which proximately caused damages to the [Crabtrees].” The Crabtrees settled and dismissed their claims against Mobile Infirmary and CHP. The trial court entered a summary judgment for J.F. Pate, which the Crabtrees did not appeal. BASF was left as the only named defendant.
On April 11, 2008, BASF filed a motion for a summary judgment based on the applicable statute of limitations. On April 24, 2008, BASF filed a supplemental motion for a summary judgment in which it argued that it did not owe the Crabtrees a duty and that the Crabtrees had failed to produce substantial evidence in support, of their claims against BASF. The Crabtrees filed responses to both motions, and BASF filed replies to those responses.
On December 3, 2008, the trial court entered a summary judgment in BASF’s favor on the ground that the period set forth in the applicable statute of limitations had expired before the Crabtrees filed their complaint. On December 23, 2008, the trial court entered a second order in which it stated that it was modifying its original order and entering a summary judgment for BASF “based on the statute of limitations, as well as the reasons stated in BASF’s motion for a summary judgment based on lack of duty and failure to present substantial evidence in support of the [Crabtrees’] claims.”
*800 The Crabtrees appealed the trial court’s judgment to this Court, but the appeal was transferred to the Court of Civil Appeals pursuant to § 12-2-7, Ala.Code 1975. The Court of Civil Appeals reversed the judgment of the trial court in a per curiam opinion. The Court of Civil Appeals concluded that the Crabtrees used reasonable diligence in substituting Degussa Corporation, a predecessor to BASF, for a fictitiously named defendant as soon as they were aware of the predecessor’s involvement. With regard to the issue of BASF’s liability as a matter of substantive law, the Court of Civil Appeals reasoned, in part, as follows:
“The Crabtrees argue that the issue whether BASF voluntarily assumed a duty to inspect is necessarily a question of fact because such questions are generally to be viewed in light of all the pertinent facts and circumstances; on the other hand, BASF asserts that assumption-of-duty issues may properly be resolved as questions of law. We agree with the Crabtrees that, under Alabama law, whether a duty to others has been assumed through a party’s affirmative conduct is to be determined in light of all the facts and circumstances. See Bryan v. Alabama Power Co., 20 So.3d 108, 119 (Ala.2009); see also Springhill Hosps., Inc. v. Larrimore, 5 So.3d 513, 516 (Ala.2008) (scope of a pharmacist’s voluntary undertaking is fact-specific).”
Crabtree v. BASF Bldg. Sys., LLC, 153 So.3d 787, 792 (Ala.Civ.App.2011) (“Crab-tree ”). The opinion went on to describe the contents of the April 15, 2003, letter from Sosa to Poole as well as testimony from Poole stating that he was “relying on” ChemRex to have someone there to inspect the preparatory work and the application of the product during the renovation of Deck II. Id. at 793.[4] The opinion then concluded:
“Although we acknowledge that the record also contains evidence indicating that the extent of ChemRex’s authority was limited to merely making recommendations to CHP when requested or when a ChemRex employee observed a condition that warranted attention, we believe that, given the current state of the record, the trier of fact must resolve the dispute concerning whether BASF, through ChemRex, voluntarily assumed, and breached, a duty to inspect the installation of the polyurethane material so as to have injured the Crabtrees.”
Id. at 793.
BASF petitioned for a writ of certiorari, questioning the ruling of the Court of Civil Appeals with respect to the statute of limitations and with respect to the issues of duty and whether there was substantial evidence to support the Crabtrees’ claims. We denied certiorari review as to BASF’s argument related to the statute of limitations; we granted certiorari review to consider BASF’s arguments concerning lack of duty and the failure to present substantial evidence.

II. Standard of Review

“In reviewing a trial court’s ruling on a motion for a summary judgment, we apply the same standard the trial court applied initially in granting or denying the motion. Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999).
“ ‘The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine *801 issue of material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present “substantial evidence” creating a genuine issue of material fact.’
“742 So.2d at 184. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).”
Swan v. City of Hueytown, 920 So.2d 1075, 1077-78 (Ala.2005).
“ ‘[To the extent] the underlying facts are not disputed and [an] appeal focuses on the application of the law to those facts, there can be no presumption of correctness accorded to the trial court’s ruling.’ Beavers v. County of Walker, 645 So.2d 1365, 1373 (Ala.1994) (citing First Nat’l Bank of Mobile v. Duckworth, 502 So.2d 709 (Ala.1987)). A ruling on a question of law carries no presumption of correctness, and appellate review is de novo. See Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999); Ex parte Graham, 702 So.2d 1215 (Ala.1997).”
Ex parte City of Brundidge, 897 So.2d 1129,1131 (Ala.2004).

III. Analysis

A. Who Decides Whether a Duty Existed?

The Court of Civil Appeals reversed the summary judgment in favor of BASF because it concluded that, “given the current state of the record, the trier of fact must resolve the dispute concerning whether BASF, through ChemRex, voluntarily assumed ... a duty to inspect the installation of the [Sonoguard] material.” Crab-tree, 153 So.3d at 793 (emphasis added). BASF contends that whether a voluntary duty existed is a question of law to be determined by the court, not a question of fact as the Court of Civil Appeals concluded. For support, BASF quotes Bryan v. Alabama Power Co., 20 So.3d 108 (Ala.2009):
“This Court has stated: ‘Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith.’ Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala.1979). ‘However, the existence of a voluntarily assumed duty through affirmative conduct is a matter for determination in light of all the facts and circumstances.’ Parker v. Thyssen Mining Constr., Inc., 428 So.2d 615, 618 (Ala.1983). The relevant inquiry often involves the scope, as well as the existence, of the duty assumed. See, e.g., Springhill Hosps., Inc. v. Larrimore, 5 So.3d 513, 516 (Ala.2008) (noting that the scope of a pharmacist’s voluntary undertaking is a fact-specific inquiry); Dailey v. Housing Auth. for Birmingham Dist., 639 So.2d 1343, 1346 (Ala.1994) (discussing the limits of the scope of a duty voluntarily assumed where landlord hired security guard); Hodge v. United States Fid. & Guar. Co., 539 So.2d 229, 230 (Ala.1989) (workers’ compensation insurance case in which this Court noted that the plaintiff bears the burden of proving the scope of the duty voluntarily assumed). Furthermore, the underlying principle that the ‘existence of a duty is a question of law for the court to resolve’ applies. Baugus v. City of Florence, 985 So.2d 413, 419 (Ala.2007).”
*802 20 So.3d at 119 (emphasis added). See also, e.g-., Taylor v. Smith, 892 So.2d 887, 891 (Ala.2004) (stating that, “[i]n Alabama, the existence of a duty is a strictly legal question to be determined by the court”); Martin v. Goodies Distribution, 695 So.2d 1175, 1179 (Ala.1997) (stating that “we must next determine whether, by providing its drivers with a list of operating procedures that included instructions relating to the safety of its child patrons under the age of eight, Goodies voluntarily assumed a legal duty to protect those children from traffic hazards that was not otherwise imposed by Alabama law”);[5] Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496, 506 (Ala.1984) (“In determining the existence of a duty, the trial court makes a legal decision. See, e.g., Hand v. Butts, 289 Ala. 653, 270 So.2d 789 (1972) (duty is a question of law).”).
Although the foregoing cases treat the question of the existence of a duty as a question of law for the court to decide, they do so in situations in which the facts upon which the duty will be determined to exist or not to exist are, themselves, not in question. In Bryan, for example, the plaintiffs claimed that a dam owner had voluntarily assumed a duty to minimize the extent of downstream flooding. It was apparently undisputed that, for parts of the year, the owner maintained the pool at .5 feet below full-pool level, thus leaving some storage capacity. The question was whether, on the basis of this fact, the court could conclude that the dam owner voluntarily assumed a legal duty to maintain additional storage capacity. This question of the existence of such a duty did not depend on the resolution of any other, unresolved, factual issues. See Bryan, 20 So.3d at 114-15.
When a genuine issue of a material fact exists, the jury must play its traditional role of a factfinder. As this Court stated in Gamer v. Covington County, 624 So.2d 1346, 1350 (Ala.1993), “[ajlthough the existence vel non of a duty is ordinarily a question of law for the court, it is not error to submit the question to the jury if the factual basis for the question is in sufficient dispute: to allow the trial court to determine such questions would undermine the traditional factfinding function of the jury.” (Second emphasis added.) See also Pickett v. Chambers Bottling Co., 716 So.2d 212, 213 (Ala.Civ.App.1998) (to same effect); Whataburger, Inc. v. Rockwell, 706 So.2d 1220, 1223 (Ala.Civ.App. 1997) (to same effect).
This Court expanded upon the issue before us in State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1998). Although Owen itself involved a fraud claim, rather than a negligence claim, the principles elucidated in Owen are applicable to both types of actions.
This Court in Owen first explained the intrinsic nature of the process in which a court engages when it decides whether the law should or should not recognize a legal duty arising from a given set of facts:
“Now that the question is squarely presented to us, we hold that the existence of a duty is a question of law to be determined by the trial judge. Simply stated, the question of duty is a judgment whether the law will impose responsibility on a party for its conduct toward another. ‘[T]he concept of duty amounts to no more than “the sum total *803 of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection” from the harm suffered.’ [Stewart M.] Speiser [et al., The American Law of Torts ], § 9:3 at 1008 [ (1985) ]. That judgment is at heart one that requires an analysis informed by precedent and principles. In other words, a duty analysis is inherently a legal analysis that entails an intellectual process of identifying, weighing, and balancing a number of competing factors — the existing law of the jurisdiction, the practicability of imposing a duty, the demands of justice, and the interests of society. . That is an analysis our legal system recognizes is best undertaken by a judge.”
729 So.2d at 839. The Owen Court then proceeded to acknowledge, however, that the question of duty is not to be decided in a vacuum and instead depends upon the existence of appropriate facts:

“Of course, the concept of duty does not exist in a vacuum. It requires a relationship between two or more parties, a relationship that can be shown only through a history of contacts, conversations, and circumstances. Determining whether there is a duty necessarily requires analyzing the factual background of the case. In that sense, whether a duty exists is a mixed question of law and fact.”

Id. (emphasis added).
As the Owen Court then cogently explained, a jury determination concerning the facts upon which a legal duty depends may be necessary:
“Restatement (Second) of Torts § 551 cmt. m (1977) aptly characterizes the proper interplay of judge and jury in the duty analysis:
“ “Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defendant’s knowledge of the fact, the other’s ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant’s knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.’
“On first glance, this section might seem to support the view that the jury can determine the duty question in certain circumstances, i.e., where the facts are disputed. But a careful reading reveals that the jury is allowed to determine only the disputed facts upon which the alleged duty rests, not the existence of the duty itself. The effect of this comment is summarized in Jones Distributing Co. v. White Consolidated Industries, Inc., 943 F.Supp. 1445, 1474 (N.D.Iowa 1996):
“ ‘Thus, the court must decide in the first instance whether the circumstances asserted, if proved, would be sufficient to give rise to a duty to disclose; if the court finds the circumstances alleged would be sufficient, the jury will then be presented with the factual question of whether those circumstances indeed existed, provided of course, at the summary judgment stage of the proceedings, the plaintiff can generate a genuine issue of material fact as to the existence of those circumstances.’
“We think that the proper duty analysis should preserve the respective functions of both the judge and the jury. The judge should decide whether, assuming as truth all of the plaintiffs factual assertions, they are sufficient to give rise to a legal duty. If, even pre *804 suming that all of the plaintiffs facts are true, the judge determines that, as a matter of law, no duty was owed, then a summary judgment ... is appropriate. If the judge finds that the circumstances as alleged would be enough to create a legal duty, then he should instruct the jury as to what that duty would be if these circumstances did exist. The jury then decides whether those circumstances indeed existed. Should the plaintiff fail to prove her facts to the jury’s satisfaction, then the jury can determine that the plaintiff did not present sufficient evidence to justify holding the defendant to the legal duty as charged by the judge. By this process, the judge retains his ability to state what the law is, while the jury retains its responsibility to state what the facts are and whether the facts as proven justify the finding of a duty under the law.”
Owen, 729 So.2d at 839^10 (emphasis added).
The foregoing principles are applicable in this case. As this Court stated in Alabama Power Co. v. Brooks, 479 So.2d 1169, 1175 (Ala.1985), a negligence case: “ ‘Where the facts upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury.’” (Quoting Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979).) Conversely, when the facts upon which the existence of a duty depends are not genuinely disputed, the task remaining is simply for the court to determine whether the alleged duty arises from those facts.

B. Did The Trial Court Correctly Decide the Question of Duty in This Case?

We turn now to the question whether the facts upon which the existence of a duty depends were sufficiently well established that the trial court correctly proceeded to decide that question and whether its decision that BASF did not have the duty asserted by the Crabtrees was correct. Applying the above-stated principles from Owen and Brooks, we conclude that the facts in this case are sufficiently well established that it was proper for the trial court to decide whether those facts gave rise to the duty asserted by the Crabtrees and that the trial court correctly decided that they do not.
We first note that the Crabtrees concede that the custom and practice of the industry is that “the manufacturer of the product may not ordinarily be responsible for the manner in which it is installed.” Further, witnesses on behalf of BASF explained an industry practice regarding job-site visits by manufacturer’s representatives that did not entail an assumption of responsibility for improper application of the product to the extent urged the Crabtrees. Roger Sosa testified that a job-site visit entailed “mak[ing] ourselves available” to the contractor, checking to see if the contractor had “any issues or problems or questions,” and pointing out a problem if one is noticed. David Cook testified that his job during the site visits “was to provide any technical service, answer any questions that Clarence [Poole] had during my visits. I was not a quality control or a quality assurance type person.”
The Crabtrees argue, however, that in this case the evidence demonstrates that “BASF voluntarily assumed a role in the installation process to insure (i.e., guarantee) that the Sonoguard product was installed correctly on Deck II.” They make much of the fact that BASF was aware that its product could be slippery if the correct amount of aggregate was not applied in a proper manner in conjunction with the application of the topcoat. This, however, is merely another way of stating *805 that BASF knew the requirements for the proper installation of its product.
Ultimately, the Crabtrees’ contention that BASF undertook a responsibility to ensure that the installation of its product was performed correctly is based on the April 15, 2003, letter written by Sosa to Poole. The Crabtrees argue as follows:
“BASF entered into an agreement with CHP that representatives from BASF would be present at various times during the project to inspect the preparatory work and application of the Sono-guard material and to insure (i.e., guarantee) that the product was installed properly. The agreement between BASF and CHP is memorialized in a letter written by Mr. Sosa on April 15, 2003.”
The Crabtrees contend that, through the April 15, 2003, letter, “BASF assumed a duty to ‘be present during various times of the project to inspect the preparatory work, application of the products and to provide any technical assistance’ as required to ‘make sure or secure, to guarantee’ that this polyurethane system was properly installed in accordance with BASF’S instructions.” Crabtrees’ brief, p. 10. The letter the Crabtrees purport to quote from does not read exactly as the Crabtrees suggest. The pertinent portion of the letter states:
“Due to complications that occurred on the previous job, we have both agreed that representatives from Chemrex, Inc. would be present during various times of the project to inspect the preparatory work, application of the products and to provide any technical assistance that may be required. In the beginning I recommend an inspection at least once a week to insure that all parties involved are in agreement with the manufacturer’s instructions.”
(Emphasis added.)
Clearly, the letter contemplates that, when inspections occurred, they would be for the purpose of “inspect[ing] the preparatory work” and the “application of the product,” as well as “providing] any technical assistance that may be required.” The letter does not say that BASF representatives would be present continually, or on a daily basis, during the installation. To the contrary, the letter concludes as emphasized, with a recommendation of only weekly inspections to ensure that the parties “are in agreement with the manufacturer’s instructions.” Furthermore, when the job started taking longer than expected, CHP and BASF agreed that the inspections could occur only every two weeks. There is no assumption of a responsibility on BASF’s part to be present on the job site at the commencement of any particular phase of the work or while any particular phase of the work was being performed.
The dissent cites the evidence discussed above and concludes that there is substantial evidence that BASF did assume a duty. Again, we agree that BASF assumed a duty; however, consistent with the foregoing discussion, that duty was not to “guarantee” the proper installation of the product. Instead, as discussed, that duty was limited to visiting the site at the behest of CHP. That is, BASF’s duty was to give advice regarding such preparatory work and product application as it might observe on those specific occasions when it was called to the site — and to exercise due care in doing so. There is no evidence indicating that BASF did not do this. That is, there is no evidence indicating that, during any visit to the site, BASF observed or should have observed some condition of the site or course of action by *806 CHP as to which it did not respond with appropriate advice.
Perhaps because of the absence of evidence of a failure by BASF to act with due care in connection with any particular site visit, the Crabtrees seek to bolster their action against BASF with a broader contention that BASF assumed a more general duty for the success of the product installation. The Crabtrees’ position essentially is that the job did not turn out well and that, therefore, BASF must bear responsibility for that fact. In other words, the Crabtrees assert that BASF took on some responsibility — or guarantee — for the outcome of the job generally. It did not.
Indeed, Poole testified that he received “technical assistance” from Cook whenever he asked for it. When he was asked what more BASF could have done on the project, Poole answered: “[It] could have been — [it] could have been there and give me a hand when I needed it more so — like [it] did on [Deck I] more so than [it] did.” Poole admitted, however, that he never asked BASF to provide that kind of assistance on Deck II. In fact, CHP never contacted BASF representatives either when it started or when it finished the remediation of Deck II in order to receive more assistance with the remediation.[6]
In short, the facts and circumstances of this case lead us to conclude that BASF did not assume a duty to provide more advice or assistance to CHP than it actually provided. “It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty.” Morton v. Prescott, 564 So.2d 913, 915 (Ala.1990). Further, the record does not contain substantial evidence that BASF failed to exercise due care in providing the particular advice and assistance that it did provide in relation to the installation of Sonoguard or that any such advice or assistance proximately caused the condition that led to Edward Crabtree’s fall.[7]

IV. Conclusion

For the reasons stated above, the trial court correctly entered a summary judgment in favor of BASF based on the evidence before it. Accordingly, the judgment of the Court of Civil Appeals is due to be reversed and the case remanded.
REVERSED AND REMANDED.
MOORE, C.J., and STUART, PARKER, and SHAW, JJ., concur.
BOLIN, J., concurs in the result.
MAIN and WISE, JJ., dissent.
BRYAN, J., recuses himself.[8]

. In its petition, BASF explained that its correct name is “BASF Construction Chemicals, LLC,” and that it was improperly named "BASF Building Systems, LLC,” in the notice of appeal to the Court of Civil Appeals.

. For the sake of simplicity and consistent with the terminology used by some of the witnesses, actions or inactions of ChemRex are sometimes referred to herein as those of BASF.

. “Shot-blasting” is part of the process of preparing the surface area for the application of the Sonoguard base coat.

. This testimony is quoted in the Crabtrees' response to the motion for a summary judgment, but the pages of the deposition the response cites are not included in the record.

. Martin is representative of the cited line of cases in that the treatment of the question of duty as one for the court was premised on established facts, i.e., there was no genuine issue of fact as to whether the defendant had "provid[ed] its drivers with a list of operating procedures that included instructions relating to the safety of its child patrons under the age of eight.” Our review indicates that the same could be said of the other cases cited.

. Thus, even if the April 15, 2003, letter could be understood as documenting an agreement between BASF and CHP for more regular or intensive involvement by BASF in the application process, the record indicates that CHP accepted the assistance that was actually provided by BASF during the work on Deck II as a fulfillment of its obligations under the letter.

. Because we conclude that the trial court properly entered a summary judgment for BASF on the ground that there is notsubstan-tial evidence that it negligently breached a duty assumed by it in regard to the application by CHP of Sonoguard to Deck II, we need not reach the question whether any such duty ran to the Crabtrees.